UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JENNARARE E. C.,[1]

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

**DECISION AND ORDER**

1:25-cv-00115 (JJM)

This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review the final determination of the Commissioner of Social Security that plaintiff was not entitled to supplemental security income ("SSI") benefits. Before the court are the parties' cross-motions for judgment on the pleadings [6, 11].[2] The parties have consented to my jurisdiction [13]. Having reviewed the parties' submissions [6, 11, 12], the Commissioner's motion is granted, and plaintiff's motion is denied.

## BACKGROUND

The parties' familiarity with the 903-page administrative record [4] is presumed. The plaintiff filed applications for child's benefits and SSI on December 20, 2021. [4] at 15. She alleged a disability beginning on November 23, 2009, but later amended her onset date to October 12, 2019 – two days prior to her 22nd birthday. Id. at 16. Plaintiff's claim was denied

---

1 In accordance with the guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Western District of New York on November 18, 2020 in order to better protect personal and medical information of non-governmental parties, this Decision and Order will identify the plaintiff by first name and last initial.

2 Bracketed references are to the CM/ECF docket entries. Page references to the administrative record are to the Bates numbering. All other page references are to the CM/ECF pagination.

initially and upon reconsideration. Id. at 15. Administrative Law Judge ("ALJ") Paul Goodale conducted a telephonic hearing on March 21, 2024. Id.; *see also* id. at 32-68 (transcript of hearing). Plaintiff and her attorney appeared. Id. at 32. ALJ Goodale heard testimony from the plaintiff, plaintiff's father, and a vocational expert. Id. at 40-65.

### A. ALJ Goodale's Decision

ALJ Goodale concluded that plaintiff was not disabled from November 23, 2009 through June 28, 2024, the date of his decision. Id. at 22-23. He determined that plaintiff's severe impairments were "depressive disorder; anxiety disorder, DiGeorge's syndrome[3]; and a heart defect (tetralogy of Fallot)". Id. at 18. He determined that plaintiff retained the residual functional capacity ("RFC") to perform work at all exertional levels with several additional limitations:

> "She can frequently stoop, crouch, crawl and kneel, can frequently climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds; she can do frequent handling and fingering bilaterally. She should avoid concentrated exposure to extreme vibration, to extreme noise, and to workplace hazards such as dangerous machinery (excluding passenger motor vehicles) and unprotected heights. The Claimant can do simple, routine, repetitive tasks, involving only simple work-related decisions, with up to occasional changes in workplace settings; she could not do assembly-line type work (i.e. working in close tandem with co-workers at a pace that is outwardly set), but could do individual table or bench work. The claimant could have occasional contact with the general public, and only minimal contact with children under age 10; and up to frequent but superficial (brief, perfunctory, routine) contact with coworkers."

Id. at 21.

---

[3] ALJ Goodale explains that "DiGeorge syndrome is a condition when a small part of chromosome 22 is missing, causing several body systems to develop poorly. The claimant's tetralogy of Fallot, seizures, hydrocephalus, anxiety, and depression can be linked to DiGeorge Syndrome". [4] at 22.

**B. Plaintiff's Testimony**

Plaintiff testified that she cannot work because of her disabilities. [4] at 42. She claimed she could focus only for 15 minutes, and that her hands begin to hurt after 10 to 15 minutes of typing. Id. at 42. She cannot lift heavy items because her back begins to spasm. Id. at 43. She can sit and stand for 10 to 15 minutes at a time before her back starts to hurt. Id. at 44. Although she could walk the length of a football field, she would have to stop halfway because her legs would be tired. Id. at 45.

Plaintiff's last seizure occurred in January 2020, but she has staring spells that last for up to a minute. It takes her approximately three to five minutes to recover from them. Id. at 45-46. She does not like to leave her house without her father and has inappropriate responses when she hears children crying. Id. at 46-47.

**C. ALJ Goodale's Analysis of the Opinion and Other Evidence**

To determine plaintiff's RFC, ALJ Goodale analyzed the evidence in the record, including plaintiff's testimony, and the medical and opinion evidence. Id. at 21-25. After summarizing plaintiff's testimony, he found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record". Id. at 22. ALJ Goodale then summarized the medical evidence. Id. at 22-24.

ALJ Goodale considered medical opinions from consultative examiners Hongbiao Liu, M.D. and Christine Ransom, Ph.D., and plaintiff's treating physician's assistant, David Russell, RPA-C. Id. at 23-24.

### 1. Physician's Assistant Russell's Opinions

Physician's Assistant ("PA") Russell submitted letters dated January 29, 2023 and February 18, 2024. In his 2023 letter, he listed plaintiff's various diagnoses. He then stated:

> "During her school years, she had a difficult time socially adjusting to the stress of interacting with other children, leading to behavior issues. Loud noises and confusion caused her to feel panicky and anxious. She has never felt socially comfortable and therefore has not been able to participate in many activities outside the home, including employment. She even has a difficult time at family gatherings with people that she knows.
>
> Therefore, because of her difficulty interacting with other people, the combination of anxiety, depression, agoraphobia, and the threat of seizure activity, I feel that she has been significantly affected in her ability to sustain full-time employment."

Id. at 752.

In his 2024 letter, he again listed plaintiff's medical conditions and concluded:

> "Because of these deficiencies, she has significant limitations in maintaining social functioning, activities of daily living and being able to concentrate effectively to complete tasks in a timely manner.
>
> Therefore, all of these issues prevent her from obtaining and maintaining gainful employment."

Id. at 897.

ALJ Goodale found PA Russell's 2023 opinion "partially persuasive". Id. at 24. He found that PA Russell's "opinion that the loud noises and confusion affect the claimant's behavior is consistent with the record which show that the claimant has strong reactions to noises from young children.". Id. He found the remaining portion of PA Russell's 2023 opinion "poorly supported because he did not use precise language in describ[ing] the claimant's functional limitations". Id.

ALJ Goodale found PA Russell's 2024 opinion "unpersuasive":

> "Dr. Russell's opinion is poorly supported, as he did not describe the symptoms caused by her medical impairments and did not use precise language to describe her functional limitations. . . . Further, Dr. Russell's opinion is inconsistent with the record which shows that the claimant has intact memory, attention and concentration. . . . Finally, to the extent his opinion purports to address the ultimate issue of claimant's ability to work, which his reserved to the Commissioner, that opinion is not considered."

Id.

**2. Dr. Liu's Opinion**

Dr. Liu examined plaintiff on March 31, 2023. Upon examination, he appreciated a heart murmur, and observed "bilateral hand tremors". Id. at 756-57. However, plaintiff's fine manipulation ability was "normal", dexterity in her hands and fingers was "intact", and her grip strength was 5/5 bilaterally. Id. at 757. In addition, he documented a deformity at T10-11 on plaintiff's low back x-ray. Id. His findings upon examination were otherwise normal. Id. at 755-56. Plaintiff exhibited a normal gait, full range of motion throughout her spine, arms, and legs, and 5/5 strength in her upper and lower extremities. Id.

Based upon his examination, Dr. Liu opined that plaintiff "should avoid height[s] and heavy machinery operation due to seizures", and "should avoid moderate exertional activity due to the cardiac condition". Id. at 757.

ALJ Goodale found Dr. Liu's opinion "partially persuasive". Id. at 23. Dr. Liu's opinion that plaintiff should avoid heights and heavy machinery, and should avoid moderate exertional activity was "supported by his examination of the claimant" and "consistent with the record which documents a seizure history and heart defect". Id. However, he found that "greater postural limitations are necessary" and found the exertional limitation unnecessary due to diagnostic testing that showed plaintiff's "left ventricular systolic function was high normal . . .

and normal right ventricular systolic function." Id. Earlier in his opinion, ALJ Goodale concluded that plaintiff's "balance issues and difficulty with her gait, as well as her history of seizures" support the RFC's postural and environmental limitations, and the limitation of exposure to workplace hazards. Id.

### 3. Dr. Ransom's Opinion

Dr. Ransom conducted a psychiatric evaluation of plaintiff on July 13, 2023. Dr. Ransom's Mental Status Examination of plaintiff was entirely normal. Id. at 761-62. She opined that plaintiff had no limitations in any sphere of mental functioning. Id. She concluded that her findings were "consistent with psychiatric conditions which are mild and episodic and mostly controlled with medication and will not interfere with the claimant's ability to function on a daily basis". Id.

ALJ Goodale found Dr. Ransom's opinion "unpersuasive". Id. at 24. While Dr. Ransom's opinion was consistent with her own examination of the plaintiff, he found it "inconsistent with the record as a whole, which documents some limitations in the claimant's mental functioning". Id. He found that the record demonstrated plaintiff had limitations "in her ability to interact with others and concentrate, as she has difficulty managing her emotions around young children and has reported difficulty with concentration". Id.

Earlier in his analysis, ALJ Goodale concluded:

> "[T]he treatment record supports that the claimant's difficulty interacting with children and maintaining attention limit her to simple, routine, repetitive tasks, involving only simple work-related decisions, with up to occasional changes in workplace settings, and that she can only have occasional contact with the general public, minimal contact with children under age 10, and up to frequent contact with coworkers".

Id. at 23.

**D. The Parties' Arguments**

Plaintiff argues that ALJ Goodale failed to properly evaluate PA Russell's opinions. [6-1] at 9-13. She argues that the ALJ did not analyze the supportability or the consistency of his opinions and, instead, rejected them "because PA Russell did not use 'precise language'." Id. at 11. Plaintiff argues the ALJ should not have used mental status examination results in plaintiff's treatment records to reject PA Russell's opinions and should have recontacted PA Russell for clarification. Id. at 11-13.

Plaintiff further argues that because ALJ Goodale did not find any of the opinions in the record fully persuasive, he impermissibly based his RFC on his own lay opinion. Id. at 13-14. She argues that ALJ Goodale crafted the RFC "without medical expert guidance". Id. at 16.

Finally, plaintiff argues that the ALJ failed to satisfy the Commissioner's burden to demonstrate there were sufficient jobs available in the national economy that plaintiff could perform. Id. at 16-20. She argues that a conflict existed between the Dictionary of Occupational Titles ("DOT") and the vocational expert's testimony that the ALJ failed to resolve. Id. at 16. The RFC limited plaintiff to "simple, routine repetitive tasks involving only simple work related decisions". Id. However, two of the jobs identified by the vocational expert require a reasoning level of three, which conflicts with the limitation to simple work. Id. Further, the remaining job – price marker – is obsolete. Id. at 18, 20. Moreover, it is a retail position, which conflicts with the limitation to "minimal contact with children under age 10". Id. at 18-19.

The Commissioner argues that ALJ Goodale's RFC is supported by substantial evidence, and that he properly analyzed the opinion evidence. [11-1] at 6-14. Further, even assuming that two of the jobs identified by the vocational expert were inconsistent with the limitation to simple work, there were a sufficient number of price marker positions in the

national economy to sustain the Commissioner's burden at step 5. Id. at 14-17. Plaintiff does not support her contention that because a job is performed in a "retail setting" it is inconsistent with the restriction to minimal contact with children under the age of 10. Id. at 15. The description of the job in the DOT does not suggest it entails contact with others generally, or with children, specifically. Id. Finally, plaintiff failed to question the vocational expert con these issues. Id. at 17. Courts in the Second Circuit have declined to reject vocational expert testimony based on a plaintiff's "conclusory proclamations to the contrary". Id. at 17.

## ANALYSIS

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938). The court is not entitled to re-weigh the evidence or to second-guess the ALJ's resolution of factual issues. "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)).

"[U]nder the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position. Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record". Cheatham v. Commissioner, 2018 WL 5809937, *9 (W.D.N.Y. 2018); *see also* Brault v. Commissioner, 683 F.3d 442, 448 (2d Cir. 2012) ("the substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*") (emphasis in original).

An adjudicator determining a claim for Social Security benefits employs a five-step sequential process. Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920. The plaintiff bears the burden with respect to steps one through four, while the Commissioner has the burden at step five. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

The RFC need "not perfectly correspond with any of the opinions of medical sources cited in his decision" and an ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole". Matta v. Astrue, 508 Fed. Appx. 53, 56 (2d Cir. 2013) (Summary Order). *See also* Young v. Berryhill, 2018 WL 2752443, *2 (W.D.N.Y. 2018) ("[i]t is well settled that an ALJ need not adopt one or more medical opinions verbatim in order to render a sufficiently-supported RFC determination"). It is "well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. . . . The opinion of a non-examining source may override that of an examining source, even a treating source, provided the opinion is supported by evidence in the record." Maleski v. Commissioner, 2020 WL 210064, *4 (W.D.N.Y. 2020); *see*

*also* Camille v. Colvin, 652 Fed. Appx. 25, 28 (2d Cir. 2016) (Summary Order) ("[t]he ALJ was permitted to consider [treating] Dr. Dawood's treatment notes in weighing the opinions of Dr. Dawood and [consulting psychologist] Dr. Kamin; and she was permitted to conclude that Dr. Kamin's opinion was more reliable").

"Ultimately it is [p]laintiff's burden to prove a more restrictive RFC than the RFC assessed by the ALJ". Beaman v. Commissioner, 2020 WL 473618, *6 (W.D.N.Y. 2020).

**B. The RFC is Supported by Substantial Evidence**

Plaintiff first argues that ALJ Goodale improperly rejected PA Russell's opinions due to his imprecise language, rather than the evidence. She argues that this falls short of a proper supportability analysis. [6-1] at 10-11. If this were the only analysis of PA Russell's treatment records, I might agree. However, it is well settled that the ALJ's decision must be "read as a whole in the context of the record before him." Green v. Saul, 2019 WL 2996502, *8 (S.D.N.Y. 2019) (*report and recommendation adopted sub nom*. Green v. Berryhill, 2019 WL 2992088 (S.D.N.Y. 2019). He is not required to repeat parts of his analysis elsewhere in his opinion to satisfy the substantial evidence standard. Anastasia F. v O'Malley, 2024 WL 1717094, *4 (N.D.N.Y. 2024) ("the ALJ's decision should be read as a whole, and it would indeed create needless formality to require the ALJ to repeat his analysis to satisfy this requirement").

Accordingly, I read ALJ Goodale's analysis of PA Russell's letters in the context of his analysis of the treatment records from Lockport Family Medicine Center, where PA Russell practiced. First, ALJ Goodale is correct that PA Russell did not particularly describe plaintiff's functional limitations. PA Russell stated that plaintiff has been "significantly affected" in her ability to work full time. [4] at 752. However, he did describe *how* plaintiff has

been affected, or identify which physical or mental functions and abilities necessary for work were affected, nor to what degree.

Earlier in his analysis, ALJ Goodale reviewed and summarized plaintiff's medical records. Id. at 22-23. He acknowledged her DiGeorge syndrome and identified several other medical conditions related to it, including tetralogy of Fallot, seizures, hydrocephalus, anxiety, and depression. Id. at 22. Her treatment notes documented other issues that could affect her functional abilities, including difficulty gaining weight, poor muscle tone, and issues with her balance and gait. Id. Both plaintiff's treating neurologist and Dr. Liu noted hand tremors on examination, but also recorded "full grip strength" and "normal fine manipulation and dexterity". Id. Based upon his review of records from Lockport Family Medicine Center (*i.e.* PA Russell), and plaintiff's treating neurologist and cardiologist, ALJ Goodale concluded that "[t]he record documents that [plaintiff] experiences infrequent symptoms from these impairments, which are managed by medication and monitoring". Id. at 22-23, *citing (both generally and with pin cites)* id. at 453-569 (PA Russell and University Neurology), 581-83 (Great Lakes Cardiovascular), 596-745 (University Neurology), 746-51 (PA Russell), 764-98 (University Neurology). These exhibits contained records from 2015 through 2023.

PA Russell cites to none of his treatment notes in either of his opinions. ALJ Goodale's analysis of the treatment notes of PA Russell and University Neurology (many of which appeared in Lockport Family Medicine's records) demonstrated there was little information in them concerning functional limitations. *See* id. at 22 (noting evidence of difficulty with balance and walking with a tandem gait, and hand tremors, but identifying records documenting full grip strength and normal fine manipulation and dexterity). PA Russell did not

describe plaintiff's limitations in functional terms in his 2023 and 2024 opinion letters. He also did not document severe functional limitations in his treatment notes.

Plaintiff argues that ALJ Goodale's consistency analysis was also flawed because he found PA Russell's opinion inconsistent with mental status examinations in the record documenting "intact memory, attention, and concentration". [6-1] at 11, *citing* [4] at 24. She argues that mental status examinations should not be used to reject medical opinions because they are a "one-time snapshot of a claimant's status" and do not consider symptoms a plaintiff may experience outside the presence of the examiner. Id., *citing* Loucks v. Kijakazi, 2022 WL 2189293, *2 (2d Cir. 2022) (Summary Order). She points out that only three of the citations made by the ALJ to support his analysis were examinations performed during the relevant period, while the remaining eight fell outside of it. Id. She argues that, given the identical findings over time, ALJ Goodale "should have considered the possibility that these notes were copied and pasted" over time. Id. at 11-12, *citing* Aurilio v. Berryhill, 2019 WL 4438196, *3 (D. Conn. 2019). Finally, she argues that the ALJ should have "recontacted PA Russell for further explanation". Id. at 12.

I agree with the Commissioner that ALJ Goodale did not err in his consistency analysis. He found that "Dr. Russell's opinion is inconsistent with the record which shows that the claimant has intact memory, attention and concentration". [4] at 24. To support his statement, ALJ Goodale cites the results of mental status examination performed by plaintiff's providers at University Neurology and Kaleida Health from September 2015 through May 2020. [4] at 28, *citing* id. at 477 (May 11, 2020), 491 (February 24, 2020), 504 (October 9, 2019), 511 (Kaleida Health, March 13, 2016), 539 (September 26, 2018), 555 (July 25, 2018), 603 (June 29,

2015), 610 (September 21, 2016), 617 (January 11, 2016), 625 (April 11, 2016), and 631 (October 12, 2016).

Elsewhere in his decision, ALJ Goodale noted that plaintiff "has not engaged in regular mental health counseling during the relevant period" and that she "is prescribed mental health medications by her primary care physician", *i.e.* PA Russell. Id. at 23. ALJ Goodale notes that plaintiff "has reported to providers that she has difficulty with being in public, especially when there are small children around". Id., *citing* id. at 747 ("[s]he still has difficulty with being in public, especially when there are small children around"). Although not quoted by ALJ Goodale, this paragraph of PA Russell's treatment note states in its entirety:

> "**ADHD, anxiety and depression.**
> **ADHD:** She has a history of ADHD that, at times, has caused difficulty with concentration and focus. However, she is currently not in school and does not feel that she needs medication at this time. She is happy with how she feels.
> **Anxiety**: the patient feels that her anxiety and depression are stable. Tolerating sertraline without side effects. She [has] been able to tolerate going to college without difficulty but has decided not to continue with her education. She still has difficulty with being in public, especially when there are small children around. Over the past year, she has gone through increased stress with her [father] diagnosed [with] prostate cancer and her grandmother dying recently with leukemia. She feels that symptoms are stable at this time and wants to continue sertraline at the current does. Denies suicidal thoughts."

Id.

Despite her protest that the results of her mental status examinations should not be used to "reject" medical opinions, plaintiff does not identify any treatment notes that call into question the results of her mental status exams, or that document poor functioning. The absence of such information in her medical records distinguishes plaintiff's case from the caselaw she cites to support her argument. *See* [6-1] at 11, *citing* Loucks, supra and Aurilio, supra. In

Loucks, the Second Circuit found it was error for the ALJ to focus on mental status examinations with normal findings, without addressing "treatment notes and other record evidence [that] consistently showed that [Loucks] had serious psychological symptoms year after year". 2022 WL 2189293 at *2. It concluded that "the ALJ selectively relied on portions of the record that showed improvement without even addressing the weight of the evidence supporting the fact that Loucks continued to have serious psychiatric symptoms even after years of treatment and steadily increasing medication." Id. There is no evidence in this record contradicting the mental status examinations cited by ALJ Goodale.

Similarly, in Aurilio, the court found that the ALJ erred when he relied upon notations that plaintiff's treating physician made under the heading "Social History" that appeared to be "copied and pasted from record to record over the course of the many years" he treated plaintiff. 2022 WL 2189293, *2. There, the ALJ did not address how other contemporaneous treatment notes from other providers, documenting significant functional deterioration over time, contradicted the (apparently stale) information in the "Social History". Id.

Finally, I find that ALJ Goodale had no obligation to further develop the record. Medical records do not appear to be missing, and the ALJ had the benefit of a complete and legible treatment record. Lowry o/b/o J.B. v. Astrue, 474 Fed. Appx. 801, 804 (2d Cir. 2012) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim"); *compare* Pratts v. Chater, 94 F.3d 34 (2d Cir. 1996) ("[m]uch of Pratt's medical history is missing . . . the medical records that do appear

in the record are frequently incomplete or illegible and provide no coherent overview of Pratt's treatment").

ALJ Goodale's analysis of PA Russell's opinions, coupled with his analysis of plaintiff's treatment notes, is sufficient to satisfy his obligation to "construct an accurate and logical bridge between his recitation of the facts and the conclusions he reached" concerning whether PA Russell's opinion was supported by his treatment notes. Lopez obo Y.T. v. Commissioner of Social Security, 2020 WL 4504987, *2 (W.D.N.Y. 2020); *see also* Commissioner's Brief [10-1] at 14-18.

ALJ Goodale did not cherry-pick the record, nor did he misrepresent PA Russell's (or any other provider's) treatment notes. Plaintiff has made no claim to the contrary. She did not identify any treatment note that supports PA Russell's opinions, nor did she point to any treatment notes that suggest additional limitations should be incorporated into the RFC.

**C. ALJ Goodale's Opinion was Based on the Medical Evidence**

Plaintiff argues that ALJ Goodale's RFC was based on his lay opinion rather than medical evidence because he found all the opinions in the record either unpersuasive, or only partially persuasive. Plaintiff's MOL [6-1] at 13-16. I do not agree.

First, "[i]t is not *per se* error for an ALJ to make the RFC determination absent a medical opinion, and remand is not necessary where 'the record contains sufficient evidence from which an ALJ can assess the [plaintiff]'s [RFC].'" Williams v. Colvin, 2016 WL 2640349, *3 (W.D.N.Y. 2016) (*quoting* Tankisi v. Commissioner of Social Security, 521 Fed. Appx. 29, 34 (2d Cir. 2013) (Summary Order)). *See also* Monroe v. Commissioner of Social Security, 676 Fed. Appx. 5, 8-9 (2d Cir. 2017) (Summary Order) (finding ALJ did not err in rejecting opinion of treating psychologist because the record contained "years' worth" of the provider's

"contemporaneous treatment notes," which contained "assessments of [the claimant's] mood, energy, affect, and other characteristics relevant to her ability to perform sustained gainful activity"); Corbiere v. Berryhill, 760 Fed. Appx. 54, 57 (2d Cir. 2019) (Summary Order) (treatment records indicating that the plaintiff could "stand and walk without difficulty" and had "full lower extremity strength" constituted substantial evidence for the RFC that plaintiff had the capacity to perform sedentary work).

Further, finding portions of an opinion unpersuasive and other portions persuasive is not the equivalent of rejecting that opinion:

> "Contrary to Cottrell's assertion, the ALJ did not wholly reject Drs. Fennelly and Toor's opinions; instead, she afforded them "partial" and "some" weight and, as discussed in greater detail below, relied on portions of them to determine Cottrell's RFC. Tr. 31-33. Just because the ALJ did not afford either opinion controlling weight does not mean that she substituted her own view of the medical evidence for those opinions. See Currie v. Comm'r of Soc. Sec., No. 17-CV-602(MAT), 2018 WL 5023606, at *3 (W.D.N.Y. Oct. 17, 2018) ("Simply because the ALJ afforded no single opinion controlling weight does not mean ... that she substituted her own expertise of the medical proof for medical opinion.").

Cottrell v. Commissioner of Social Security, 2019 WL 201508, *3 (W.D.N.Y. 2019).

Here, ALJ Goodale assessed the supportability and consistency of the opinions of two consultative examiners and plaintiff's treating physician's assistant. He explained clearly which portions of those opinions he found persuasive, and explained why. For those opinions he felt were only partially persuasive, he identified the evidence upon which he relied to incorporate a greater or lesser limitation into the RFC. For example, ALJ Goodale found Dr. Liu's opinion "partially persuasive". [4] at 23. Dr. Liu opined that plaintiff "should avoid heights and heavy machinery operation due [to] seizures and should avoid moderate exertional activity due to the cardiac condition". Id. He found that Dr. Liu's opinions were "supported by his examination of

the claimant documenting that she has a 3/6 systolic murmur in the left middle clavicle." He incorporated into the RFC Dr. Liu's limitations working at heights and near heavy machinery. Id. at 21. However, he found that "greater postural limitations were necessary", citing University Neurology treatment notes documenting difficulties with balance and spasticity in both legs. Id. at 504, 518, 775. The RFC reflects limitations to "frequent" postural activities such as stooping, crouching, crawling, kneeling, and climbing ramps and stairs". Id. at 21. Earlier in his analysis, ALJ Goodale stated that these and other limitations were supported by plaintiff's "balance issues and difficulty with her gait, as well as her history of seizures". Id. at 23.

However, aLJ Goodale rejected Dr. Liu's opinion that plaintiff should "avoid moderate exertional activity due to the cardiac condition". Id. He found that opinion "inconsistent with the record which contains an Echocardiogram performed on September 17, 2020, which revealed left ventricular systolic function was high normal with an ejection fraction of between 70-75% and normal right ventricular systolic function." Id.

Plaintiff argues the ALJ's assessment of her mental limitations are particularly problematic. However, as discussed above, limitations in the RFC to simple work, limited contact with the general public, and no contact with children is supported by her reports to her providers of difficulty with concentration and interacting with others – particularly children. Id. at 23-24, *citing* id. at 747 (documenting difficulty with concentration and focus at times due to her history of ADHD, and being in public especially where there are children, but going to college without difficulty, declining medication for ADHD symptoms, and reporting that her anxiety symptoms were stable).

**D. ALJ Goodale Sustained the Commissioner's Burden at Step 5**

Finally, plaintiff argues that ALJ Goodale failed to satisfy the Commissioner's burden to demonstrate that there are a substantial number of jobs in the national economy that she could perform with her RFC. Plaintiff's MOL [6-1] at 16-20. Based on the testimony of the vocational expert, ALJ Goodale found that plaintiff could perform the jobs of mail sorter, price marker, and document preparer. Plaintiff argues that the jobs of mail sorter and document preparer require a reasoning ability exceeding the abilities of one limited to simple work, as defined in the DOT. Id. at 17.

The DOT categorizes and describes jobs available in the national economy. For each job it describes, the DOT includes information on the nature of that job. Each DOT description has a "trailer" that includes information on the physical characteristics of each position, including whether the job is sedentary, light, medium, or heavy; how much weight a person would be required to lift in that job; and how much walking, sitting, and standing are required. *See* DOT Parts of the Occupational Definition.[4] It also includes an assessment of the general education requirements a person would need to develop to perform each job. Id. Those requirements include reasoning, mathematical, and language development. *See* DOT, Appendix C: Components of the Definition Trailer.[5] Relevant here, reasoning level 3 requires a person to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations". Id. Reasoning level 2 requires a person to "[a]pply commonsense understanding to carry out detailed by uninvolved written or oral instruction" and "[d]eal with problems involving a few concrete variables in or from standardized situations". Id.

---

[4] Available at: https://occupationalinfo.org/front_223.html (last viewed October 6, 2026).

[5] Available at: https://occupationalinfo.org/appendxc_1.html (last viewed October 6, 2026).

The DOT classifies the jobs of mail sorter and document preparer as reasoning level 3. *See* DOT Document Preparer, 1991 WL 672349; DOT Mailroom Clerk; Mail Sorter; Postal Clerk, 1991 WL 671813. The Second Circuit has recognized that "some courts of appeals have found that jobs requiring a reasoning level of three are *per se* inconsistent with unskilled work". Gibbons v. Commissioner, 2023 WL 3830774, *2 (2d Cir. 2023) (Summary Order); *citing* Zirnsak v. Colvin, 777 F.3d 607, 617-18 (3d Cir. 2014) (describing a split of authority whether there is a conflict between a job requiring reasoning level 3 and a limitation to simple, routine tasks and unskilled work).

Instead of addressing this argument, the Commissioner argues that the remaining job – price marker – alone satisfies the Commissioner's burden of proof. Commissioner's Brief [11-1] at 14-17. The DOT identifies Price Marker as a job in the "Retail" or "Wholesale" trade industry and provides a description of the job's primary duties:

> "Marks and attaches price tickets to articles of merchandise to record price and identifying information: Marks selling price by hand on boxes containing merchandise, or on price tickets. Ties, glues, sews, or staples price ticket to each article. Presses lever or plunger of mechanism that pins, pasts, ties, or staples ticket to article. May record number and types of articles marked and pack them in boxes. May compare printed price tickets with entries on purchase order to verify accuracy and notify supervisor of discrepancies. May print information on tickets, using ticket-printing machine".

DOT Marking Clerk; Merchandise Marker; Price Marker; Ticket Maker, 1991 WL 672802. This position requires reasoning level 2 ability. Id.

Plaintiff argues first that a job performed in a retail setting could not be "guaranteed to have 'minimal contact' with children". Plaintiff's MOL [6-1] at 18-19. She argues next that the price marker job no longer exists in significant numbers in the national economy. Id. at 19. The Commissioner argues that the DOT description of the job does not

indicate any contact with others, let alone with children. Commissioner's Brief [11-1] at 15. Second, he argues that it is not the role of the court to second-guess a vocational expert's testimony concerning whether jobs exist based upon a plaintiff's "conclusory proclamation to the contrary". Id. at 17. I agree with the Commissioner.

First, plaintiff's attorney did not question the vocational expert on either of these issues during the hearing. *See* [4] at 64. Plaintiff's counsel did not object to the vocational expert's qualifications. Id. at 60. Further, ALJ Goodale specifically asked the vocational expert whether her testimony was "generally . . . consistent with the DOT and the SCO [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles] except as you indicated". Id. at 64. The vocational expert testified that it was. Id. Plaintiff did not submit any evidence that such a job would have to be – or is even contemplated to be – performed during business hours on the retail floor in the presence of retail customers, rather than in a storage area, warehouse, or during hours when a retail business is closed to the general public.

The cases cited by plaintiff to support her contention that price marker jobs may be obsolete do not support that proposition. In Henderson v. O'Malley, 2024 WL 127843 (E.D.N.Y. 2024), the court expressed:

> "Given the prevalence of bar codes, PLU (price look-up) codes and the like, it seems unlikely that significant numbers of price markers continued to wield pricing guns, or do similar work, in the nation's retail outlets in 2015 and 2016.
>
> That said, because plaintiff has not raised this issue, the Court declines to address it *sua sponte*.

Id. at *6 (emphasis added). Contrary to plaintiff's assertion that the Henderson court addressed this issue "head on" ([6-1] at 19), the court's refusal to address the issue renders its supposition

mere *dicta*. Further, in Wagner v. Commissioner, 620 F.Supp.3d 3 (E.D.N.Y. 2022), the court addressed the obsolescence of the jobs of “photo finishing counter clerk” and “children’s attendant” (one who “monitors behavior of unaccompanied children in children’s section of theater to maintain order”). Id. at *2. It did not discuss the price marker position.

Plaintiff identifies no court willing to conclude as a matter of law that the “price marker” job is obsolete. Other courts in this circuit have declined the invitation to do so based only on a plaintiff’s conclusory assertions. For example, the court in Chaderick G. V. Commissioner, 2024 WL 4767031, *4 (S.D.N.Y. 2024) addressed the same argument. There, plaintiff argued that the job of “marker” was obsolete. The court reasoned:

> “Other courts, including the Second Circuit in an unpublished decision, have declined to make a judicial finding as to whether an occupation is obsolete and have concluded that the ALJ is entitled to rely on the vocational expert’s testimony. . . .
>
> Notably, Plaintiff was represented by counsel during the administrative hearing. Counsel had no objection to the vocational expert’s qualifications . . . and declined the opportunity to cross-examine the expert. . . . This would have been an appropriate time for counsel to ask the expert whether the marker position is obsolete”.

Id. at *3-4.

Further this court has expressed a reluctance to second-guess a vocational expert’s testimony concerning jobs available in the national economy. In Angi W. v. Commissioner, 2023 WL 2595008 (W.D.N.Y. 2023), the plaintiff argued that two of the three jobs the vocational expert testified she could perform were obsolete, and questioned the vocational expert’s testimony concerning the number of jobs available in the national economy for the third position identified. Id. at *9. The court concluded:

> “[B]ecause the charge account clerk position itself involves a significant number of jobs in the national economy that Claimant

> can perform, the Court need not consider Claimant's argument that the other two jobs the VE identified – addresser and document preparer – were obsolete. . . . [T]he ALJ does not have a corresponding duty to find that each of the three jobs offer significant numbers of jobs in the national economy: one occupation is sufficient. . . . In any event, the Court would be loath to conduct its own analysis of job types and job availability and second guess the vocational expert's conclusions."

Id. at *11.

I likewise decline to conduct such an analysis. The vocational expert's qualifications and testimony went unchallenged at the plaintiff's hearing. Plaintiff's attorney had the opportunity to question the vocational expert at the hearing, and did so, but did not raise this issue. Plaintiff has submitted nothing but argument to support her guess that the price marker job is obsolete. Given the court's own experience with retail settings and observing price tags attached to articles of new clothing and price stickers attached to new books (as just two examples), I cannot state as a matter of law that common experience and technology have rendered a price marker job such a dinosaur that the vocational expert's testimony must be false.

**CONCLUSION**

For the reasons stated above, Commissioner's motion for judgment on the pleadings [11] is granted, and the plaintiff's motion for judgment on the pleadings [6] is denied.

**SO ORDERED**.

Dated: October 27, 2026

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge